Brent D. Sokol (State Bar No. 167537)
Charlotte S. Wasserstein (State Bar No. 279442)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071.2300
Telephone:  +1.213.489.3939
Facsimile:  +1.213.243.2539
Email:      bdsokol@JonesDay.com
Email:      cswasserstein@JonesDay.com

Attorneys for Plaintiffs
MUNHWA BROADCASTING
CORPORATION; MBC AMERICA
HOLDINGS, INC; SEOUL BROADCASTING
SYSTEM INTERNATIONAL, INC.; and KBS
AMERICA, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MUNHWA BROADCASTING CORPORATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CREATE NEW TECHNOLOGY (HK) CO. LTD., et al., <br><br> Defendants. | Case No. CV14-4213-RGK-RZx <br><br> Assigned for all purposes to Hon. R. Gary Klausner <br><br> **PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON LIABILITY AGAINST CREATE NEW TECHNOLOGY (HK) CO. LTD. AND DU HYUN SONG** <br><br> Date:     May 18, 2015 <br> Time:     9:00 a.m. <br> Place:    Courtroom 850 <br> Judge:    R. Gary Klausner |

Pursuant to Fed. R. Civ. P. 56(c), Plaintiffs Munhwa Broadcasting Corporation; MBC America Holdings, Inc.; Seoul Broadcasting System International, Inc.; and KBS America, Inc. submit this Statement of Undisputed Facts in support of its concurrently-filed Motion for Summary Judgment On Liability Against Create New Technology (HK) Co. Ltd. And Du Hyun Song, with citations to supporting evidence. [1]

|  | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| **The Parties** | | |
| 1. | Plaintiff Munhwa Broadcasting Corporation ("Munhwa") is a Korean Corporation having its principal place of business at 31, Youido-dong, Youngdeungpo-gu, Seoul, 150-728, Republic of Korea. | Kim Decl. ¶¶ 1-2. |
| 2. | Plaintiff MBC America Holdings, Inc. ("MBC") is a California Corporation and wholly owned U.S. subsidiary and licensee of Munhwa.  MBC's principal place of business is 3400 West 6th Street, Los Angeles, California 90020. Munhwa is one of the largest television networks in South Korea, similar in scope to NBC, CBS, or ABC in the United States. Munhwa and MBC produce, own, license, and distribute a wide variety of television programming that is subject to copyright | Kim Decl. ¶¶ 1-2. |

[1] Unless otherwise indicated, all exhibits refer to the documents attached to the concurrently-filed Declaration Of C. Wasserstein filed concurrently herewith.

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | protection, including dramas, comedies, broadcast news, documentaries, and sports. | |
| 3. | Plaintiff Seoul Broadcasting System International, Inc. ("SBS") is a California Corporation and the wholly owned U.S. subsidiary and licensee of Korean broadcaster SBS Media Holdings Co., Ltd.  SBS' principal place of business is 3530 Wilshire Boulevard, Suite 1000, Los Angeles, California 90010. The SBS Network is one of the largest television networks in South Korea, similar in scope to NBC, CBS, or ABC in the United States. The SBS Network produces, owns, licenses, and distributes a wide variety of television programming that is subject to copyright protection, including dramas, comedies, broadcast news, documentaries, and sports. | Lee Decl. ¶¶ 1-2. |
| 4. | Plaintiff KBS America, Inc ("KBS") is a California Corporation and the wholly owned U.S. subsidiary and licensee of Korean Broadcasting System and/or its affiliates.  KBS' principal place of business is 625 S. Kingsley Drive, Los Angeles, California 90005.  Korean Broadcasting | Chang Decl. ¶¶ 1-2. |

2

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | System is one of the largest television networks in South Korea, similar in scope to NBC, CBS, or ABC in the United States. Korean Broadcasting System and KBS produce, own, license, and distribute a wide variety of television programming that is subject to copyright protection, including dramas, comedies, broadcast news, documentaries, and sports. | |
| 5. | Defendant Create New Technology (HK) Co. Ltd ("Create") is a Hong Kong company with a registered address of Room D, 10/F, Billion Centre, 1 Wang Kwong Road, Kowloon Bay, Kowloon, Hong Kong. | Dkt. 110 at 11 (SAC alleging this information); Dkt. 123 at 6 (Create's Answer). |
| 6. | Create New Technology International Limited is Create's parent company. | Dkt. 124 at 2 (Create's certificate of interested parties). |
| 7. | Defendant GreatVision is a People's Republic of China company, with a registered address of 101, South of 1A, Building R2, Gaoxin Industrial Village, 020 Gaoxinnanqidao, Nanshan District, Shenzhen, China. | Ex. 2 [Shenzhen Market Supervision and Management Bureau -Commercial Information and Credit Check]. |
| 8. | Defendant Dylan Song ("Song") is an individual residing in the Los Angeles area. | Ex. 3 [Song Dep.] 8:15-9:7. |

| | **UNDISPUTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
| 9. | Defendant Chris Kim ("Kim") is an individual residing in the Los Angeles area. | Ex. 4 [Kim Dep.] 11:6-13. |
| **Create Manufactures And Distributes TVpads** | | |
| 10. | Create manufactures and distributes the TVpad device. | Ex. 13 (document produced by Create starting with Bates-number 2954 showing its website stating that it manufactures and distributes TVpads). |
| 11. | Ms. Darline Huang ("Huang") was the Manager of its Korean language TVpad related business and local Korean language market development. | Ex. 21; Ex. 3 [Song Dep.] 26:17-27:15. |
| 12. | Create also repairs defective TVpads when they break. | Ex. 29 [1/13/15 email from Song to Huang sending a list and photos of defective TVpads]; Ex. 30 (1/26/15 email from Song to Huang sending a list and photos of defective TVpads); Ex. 35; Ex. 83; Ex. 38; Ex. 5 [Media Journal Dep.] 148:1-4. |
| 13. | Create ships thousands of TVpads to the United States.  For instance, in February 2015, Create shipped 3,000 TVpad4s to a company it uses for "storage and [order] fulfillment services," YTC Summit International, Inc. ("YTC"), located  at 12037 Clark Street, Arcadia, CA  91006. | Ex. 6 [YTC Dep.] 99:21-3; 50:10-53:2. |
| 14. | With the exception of the February 2015 | Ex. 6 [YTC Dep.] 101:25- |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | shipment of 3,000 TVpads, YTC has shipped its entire inventory of TVpads to individual U.S. customers according to Create's instructions. | 102:7. |
| 15. | Create has not indicated to YTC that it has any intention of stopping its shipment of TVpads into the United States. | Ex. 6 [YTC Dep.] 116:6-19. |
| 16. | Create also ships TVpads directly to consumers and distributors. | Ex. 6 [YTC Dep.] 59:22-60:6; Ex. 54. |
| 17. | Create's TVpad distributors in Korea have already been preliminarily enjoined from selling the device due to infringement of these same works. | Ex. 34 (March 13, 2015 preliminary injunction issued by Korean Court, with certified translation). |
| **Create Controls and Directs the TVpad Retransmission Network** | | |
| 18. | To retransmit live broadcasts and video programs on demand, the Create Group operates a closed, centrally managed global P4P digital broadcast transmission service. P4P stands for "proactive provider participation for P2P" and it differs from the traditional P2P ("peer to peer") protocol since the system operator, not the user, specifies the peer or server from which the requested content is retransmitted. | Ex. 11 [Crocker Report] ¶¶ 6-7. |
| 19. | The Create Group's broadcast transmission service employs a GreatVision "live broadcast transmission/VOD [Video on Demand] system." | Ex. 11 [Crocker Report] ¶¶ 6-7, 17. |

5

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 20. | Through the GreatVision stream media server, the Create Group controls which publishing servers it permits on its broadcast transmission network, what broadcasts it lists as available for request by its service users, what broadcasts it retransmits to its service users, to which service users ("peers" or "nodes") it retransmits the broadcasts, and from which of its servers and nodes it retransmits tiny pieces of the broadcasts. | Ex. 11 [Crocker Report] ¶ 12. |
| 21. | As part of its transmission process, the Create Group provides each requesting service user with access to its "server inquiry content resource and user list"—also known as an electronic program guide ("EPG") or "trackers." Through its trackers, the Create Group tracks a limited number of transmission request software programs. | Ex. 11 [Crocker Report] ¶ 12. |
| 22. | Create disseminates advertisements over the TVpad retransmission network. | Ex. 76 (advertisement for TVpad promotion at Los Angeles rock concert, provided to Create by Song); Ex. 5 [Media Journal Dep.] 85:14- 93:25. |
| 23. | Create's Transmission Application Software Provider Agreements also make plain that Create has the right to control use of the Transmission Applications on the servers; indeed it contracted for the right to "collect and analyze the data of | Ex. 14 [CNT 1176-78, "Third Party Application Publish Agreement"] ¶ 3.4, ¶ 4 (granting Create the right to delete infringing content without prior consent of the |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | using of such application software." | Transmission Application publisher), ¶ 5 (permitting disclosure of information related to Transmission Applications according to applicable laws and regulations); Dkt. 161 at 7-8 (Create's opposition to Plaintiffs' motion to compel discovery stating that there are no physical signed copies of this agreement because it is a "click through" electronic agreement). |
| 24. | Create has the contractual right to kick users off the TVpad retransmission network. | Ex. 15 (photograph of TVpad displaying section 3.10 of the TVpad User Agreement); Ex. 35 (1/8/14 email from Huang to Kim, stating that for a defective device, "[t]he technical team at the headquarters will block the service for the defective device after checking the MAC number"). |
| 25. | Create instructed its fulfillment center to report back to Create via a GVTV server the unique "MAC" number of each device that the fulfillment center ships out,  The fulfillment center's owner, a former Lockheed electrical engineer with a master's degree in electrical | Ex. 6 [YTC Dep.] 79:16-80:17. |

7

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | engineering, opined that Create wanted the MAC numbers so it could "limit certain channels that will come through or not be able to have any channels coming through." | |
| 26. | When a user returns a defective TVpad, Create records the TVpad's unique MAC address and directs GVTV to terminate its authentication on the Create network. | Ex. 35. |
| 27. | Create operates and owns servers on which the data for the Infringement Applications is stored, and, in Kim's words, "charges people who upload the content for the application to store what they upload onto a server." | Ex. 4 [Kim Dep.] 141:14-142:7, 142:8-12 (testifying that Create charges a fee to TVpad application developers to cover "the expenses for the headquarters in Hong Kong that Create company to maintain and operate the [content] server"); Ex. 43 (email from Huang to Song stating that "servers in all foreign countries other than China are being hacked" and so a DB app only works on a certain DNS); Ex. 11 [Crocker report] ¶¶ 25-28; Ex. 52; Ex. 53. |
| 28. | For example, knowing that many customers would be anxious to watch copyrighted telecasts of the 2014 World Cup, Huang sent an email from her Create email address to Song, stating that it has "assigned special workforce for | Ex. 36. |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | server management and technology teams, who will be responsible to ensure undisturbed use for customers during the World Cup." | |
| 29. | Song wrote to Huang after his customers encountered difficulties using KKS and Solive to watch unauthorized transmissions of the World Cup, and stated that "I think there is a problem with the server in Hong Kong." | Ex. 37. |
| 30. | That email specifically provided that if Solive wasn't working to watch the World Cup games, Create's "technology team can solve the problem" if provided with the MAC number and other information about the TVpad channel being used to watch the copyrighted programming. | Ex. 36. |
| 31. | As recently as February 10, 2015, Huang emailed U.S. Korean language distributor Song and other Korean language distributors indicating that even during the Chinese New Year holiday, Create's "dedicated server monitoring staff work normally" at the "[h]eadquarters" to "find and solve problems" related to "each system and application's corresponding server or content provider[,]" and provided the Infringement Applications as an example. | Ex. 38. |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | **TVpad Users Directly Infringe Plaintiffs' Copyrighted Works Without Plaintiffs' Authorization.** | |
| 32. | Plaintiffs own or control the copyrights, or exclusive rights under copyright, in, *inter alia*, the works identified in the declarations of Plaintiffs filed herewith ("Copyrighted Works"). | *See generally* Kim Decl.; Lee Decl.; Chang Decl. |
| 33. | Munhwa is the beneficial and/or legal owner of all right, title, and interest in the copyrights of certain television programs and broadcasts created by or for it for public performance and/or distribution. | *See generally* Kim Decl. |
| 34. | SBS is the beneficial and/or legal owner or exclusive licensee of all right, title, and interest in the U.S. copyrights of television programs and broadcasts created by or for its parent company for public performance and/or distribution. | *See generally* Lee Decl. |
| 35. | KBS is the beneficial and/or legal owner or exclusive licensee of all right, title, and interest in the U.S. copyrights of television programs and broadcasts created by or for its parent company for public performance and/or distribution. | *See generally* Chang Decl. |
| 36. | Plaintiffs have not licensed to any of the Defendants in this case or any other person or entity the right to publicly display or perform, distribute, retransmit or reproduce its television programs or other works in which they hold the copyrights via the TV pad retransmission network. | Kim Decl. ¶ 9; Lee Decl. ¶ 9; Chang Decl. ¶ 9. |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 37. | Nor have any other Korean networks. | *See* Ex. 12 [Park Decl.] ¶ 4; Ex. 26 (N+ termination letter from Create requesting evidence of license and terminating agreement in absence of same). |
| 38. | TVpads transmit Plaintiffs' programming to the public, and that programming includes the Copyrighted Works and the Marks. | Ex. 44; Ex. 7 [Kang Dep.] 40:22-24 ("I saw those things that were available on TVpad, such as KBS, MBC, SBS."); Ex. 4 [Kim Dep.] 29:9-20, 33:2-33:20, 39:1-4; Se Jin O Decl. ¶ 14. |
| 39. | For example, TVpads transmitted the Korean telecasts of the World Cup to the public; Plaintiff Munhwa holds the copyright to its telecast of the games. | Ex. 4 [Kim Dep.] 70:3-14; Kim Decl. ¶ 3. |
| 40. | Similarly, TVpads transmit Korean telecasts of Dodgers games to the public; Plaintiff Munhwa holds the copyright to that programming. | Ex. 8 [Lyu Dep.] 43:7-24, 46:6-21; Kim Decl. ¶ 3; Ex. 86. |
| 41. | TVpads also transmit Plaintiffs' entire library of television shows, including as an example *Running Man*, the rights to which Plaintiff KBS holds the registered copyright. | Lee Decl. ¶ 3; Ex. 4 [Kim Dep.] 73:9-24, 93:7-21; Ex. 11 [Crocker Report] ¶ 46. |
| 42. | In fact, TVpads transmit Plaintiffs' entire catalog of programming to the public, both live (24 hours a day, every day) and on demand. | Ex. 44; Ex. 7 [Kang Dep.] 40:22-24. |
| 43. | TVpads transmit the infringing content to | Ex. 11 [Crocker Report ] ¶ |

| | **UNDISPUTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
| | the public without a license by means of certain retransmission request software applications ("Transmission Applications")  including but not limited to Solive, KKS, N+. the "DB" set of Transmission Applications, and HOT韩剧社 (collectively the "Infringement Applications"). | 11; Paek Decl. ¶ 11 & Ex. 4; Ex. 7 [Kang Dep.] 41:13-15 (testifying he used Solive and KKS to watch Plaintiffs' programs); Ex. 3 [Song Dep.] 92:23-93:6; Se Jin O Decl. ¶ 14; Wasserstein Decl. ¶ 3; Ex. 1. |
| 44. | The N+ Store is a Transmission Application that provides access to the Infringement Applications, it provides a gateway to download and install the other Infringement Applications. | Ex. 3 [Song Dep.] 131:25-132:5. |
| 45. | The Infringement Applications can be loaded onto TVpads either by transferring them onto the device from a USB stick or downloading them directly onto the device via the "TVpad Store." | Ex. 45 (5/7/14 email from Huang to Song attaching Infringement Applications in a "Korean Application Package" and saying "you can install . . . by saving it to a USB"); Ex. 5 [Media Journal Dep.] 131:7-13. |
| 46. | Solive and KKS offer live streams of Plaintiffs' copyrighted works, 24 hours a day.  12 of the 21 channels on Solive are MBC, KBS and SBS name brand channels. | Paek Decl. ¶ 11 & Ex. 4; Ex. 3 [Song Dep.] 92:23-93:6; Ex. 41; Ex. 5 [Media Journal Dep.] 44:3-21; see generally Lee Decl.; Chang Decl.; Kim Decl. |
| 47. | The "DB" set of Transmission Applications, one of which is sometimes known as "Reply the Drama," offer vast libraries of Plaintiffs' Copyrighted Works on demand, organized by type of show. | Paek Decl. ¶ 11 & Ex. 4; Ex. 3 [Song Dep.] 94:1-96:14; Ex. 41. |

12

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 48. | The HOT韩剧社 Transmission Application transmits Plaintiffs' Copyrighted Works to the public in video on demand format, but also includes Chinese subtitles. | Wasserstein Decl. ¶ 3; Ex. 1 [photos of HOT韩剧社 Transmission Application in operation on TVpad4]; Ex. 11 [Crocker Report] ¶ 11. |
| 49. | The latest TVpad model, TVpad4, features and promotes the HOT韩剧社 Transmission Application; 24 out of the 25 television series provided are Plaintiffs'. | Wasserstein Decl. ¶ 3; Ex. 1 [photos of HOT韩剧社 Transmission Application in operation on TVpad4]; Ex. 11 [Crocker Report] ¶ 11. |
| 50. | In the case of live broadcast television, each TVpad not only receives data comprising Plaintiffs' Copyrighted Works *but also retransmits the works to other TVpad users*. | Ex. 11 [Crocker Report] ¶¶ 7-10. |
| **Media Journal, The Major Korean-Language TVpad Retailer, Induced Customers to Infringe Plaintiffs' Copyrights By Installing The Infringement Applications Onto TVpads For Its Customers** | | |
| 51. | Media Journal, Inc. ("Media Journal") was formed after Defendant Dylan Song purchased another business that had been selling TVpads, Koreana News ("Koreana"), which had been owned by non-party Mr. Hyuk Jin Kwon. | Ex. 46; Ex. 129; Ex. 4 [Kim Dep.] 28:20-29:2; Ex. 17 (Song Interrogatory Response No. 5); Ex. 19 (Media Journal Interrogatory Response No. 5). |
| 52. | Song knew when he purchased Koreana's assets that TVpads were used to view Plaintiffs' Copyrighted Works for free. | Ex. 48 (Koreana email to Song showing Plaintiffs' logos and the Infringement Applications); Ex. 3 [Song Dep.] 116:14-117:16; Ex. 39 (Koreana TVpad business |

13

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | | plan touting "real time channels" including Plaintiffs' networks and noting that "120,000 episodes of various drama, entertainment shows, movie and others are provided as VOD"). |
| 53. | Song is and has always been Media Journal's president, CEO and sole shareholder. | Ex. 3 [Song Dep.] 115:3-116:9; Ex. 5 [Media Journal Dep.] 21:22-25. |
| 54. | Defendant Chris Kim began working at Koreana News in June 2013. | Ex. 4 [Kim Dep.] 28:2-3. |
| 55. | Koreana was an "authorized reseller" of TVpads, as designated by Create, and Mr. Kwon used Kim's address when he applied with Create to be an authorized reseller of the devices. | Ex. 4 [Kim Dep.] 48:13-19, 52:3-53:5; Ex. 3. |
| 56. | When he founded Media Journal, Song received over $160,000 to purchase Koreana News and TVpads from Mr. Chris Lim, the principal of Defendant Best4U, Inc. | Ex. 49; Ex. 3 [Song Dep.] 108:13-109:24; Lim Dep. 48:10-49:5. |
| 57. | Song and Mr. Lim had intended that Mr. Lim's investment would be repaid by way of a set amount per TVpad sold that Song would pay to Mr. Lim. | Ex. 50. |
| 58. | Song never paid Lim back for the money he had invested in Media Journal's TVpad business. | Ex. 5 [Media Journal Dep.] 171:21-172:4. |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 59. | Media Journal began selling TVpads in January 2014. | Ex. 17 [Song Interrogatory Responses No. 1]; Ex. 19 [Media Journal Interrogatory Responses No. 1]. |
| 60. | Kim stayed on at the business that became Media Journal, after Song purchased Koreana News. | Ex. 4 [Kim Dep.] 59:20-23. |
| 61. | Media Journal orders TVpads directly from Create, which ships them to Media Journal by DHL. | Ex. 54; Ex. 4 [Kim Dep.] 147:4-12; Ex. 17. |
| 62. | The reason Korean-speakers in the U.S. buy TVpads is to watch Plaintiffs' copyrighted works; Plaintiffs comprise the three most-watched Korean television networks. | Ex. 7 [Kang Dep.] 57:7-9 (Q: "Why did your customers buy TVpads?"  A: "I think they bought them because they wanted to see Korean broadcasting programs."), 75:13-23; Ex. 39 [Koreana business proposal stating that real time channels include MBC, KBS, SBS]; Ex. 51 [Song email "to esteemed colleagues across the States" stating that TVpads allow "Koreans to watch Korean broadcasting programs anywhere in the world"]; Ex. 4 [Kim Dep.] 39:14-19, 44:5-8 (Q: "So you are not aware of any other selling point other than the Korean broadcasting aspect of the |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | | TVpad device; is that correct?"  A:  Correct."); Ex. 8 [Lyu Dep.] 47:25-48:5 (testifying his "primary purpose" in purchasing a TVpad for use in his restaurant was to watch Korean telecasts of Dodgers games), 71:15-24; Ex. 32 [certified translation of the YouTube video created by and featuring Song demonstrating a TVpad]; Notice of Lodging [copy of video on USB stick]; Ex. 3 [Song Dep.] 105:12-16, 113:10-114:6 (testifying there is no reason his customers would like the TVpad product except to "view the Korean programs in realtime"); Se Jin O Decl. ¶ 13 ("Most customers knew that they could watch MBC, SBS and KBS on TV pads before they bought them, and customers mainly bought TV pads so they could watch those channels."). |
| 63. | Create knows this; it calls the Infringement Applications the "frequently" "used" apps. | Ex. 40 (5/12/14 email "re-sending the app installation file which is used frequently."). |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 64. | Huang sometimes used an email address bearing the name "Yafans" when conducting Create business. | Ex. 4 [Kim Dep.] 136:18-24; Ex. 43; Ex. 66; Ex. 59; Ex. 45; Ex. 55; Ex. 56. |
| 65. | Huang spoke to Dylan Song at least once a week while Media Journal was in business. | Ex. 5 [Media Journal Dep.] 45:25-46:6. |
| 66. | In fact, Song visited Huang at her place of business in Shenzhen, China, and took sightseeing photos with her. | Ex. 3 [Song Dep.] 30:3-31:2, 57:7-58:8; Ex. 20 [Depo Screenshot Photo]. |
| 67. | Media Journal admits that the "vast majority" of Media Journal's sales were "made to members of the Korean or Korean-American community," and those purchasers use TVpads to "watch live Korean broadcasts for free." | Ex. 18 [Media Journal RFA Responses Nos. 4, 52]. |
| 68. | In fact, Create asked Song for "usage reviews of the 21 channels that were available on Solive," and noted that "KBS Drama Channel, SBS Plus Channel and MBC Drama Channel" are all available on "DB Drama," also noting as to usage that "the channel that people don't watch out of 21 channels is OCN." | Ex. 41; Ex. 5 [Media Journal Dep.] 40:19-41:21. |
| 69. | Media Journal received the Infringement Applications from Create by email sent by Huang. | Ex. 57 (2/12/14 email from Huang instructing: "Please install using the attached files," and attaching the Infringement Applications); Ex. 58 (5/28/14 email from Huang to Song transmitting Solive application file to |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | | Song); Ex. 59 (2/11/14 email from Huang to Song saying "If TVpad store cannot be recognized, please install using the attached files" and attaching Infringement Applications); Ex. 45 (5/7/14 email from Huang to Song attaching Infringement Applications in a "Korean Application Package" and saying "you can install . . . by saving it to a USB"); Ex. 55 (5/7/14 email from Huang to Song transmitting zip file of Infringement Applications); Ex. 40 (5/12/14 email from Huang to Song attaching Infringement Applications and calling them "app installation file which is used frequently"); Ex. 5 [Media Journal Dep.] 126:6-9. |
| 70. | Huang directed Media Journal employees to install the Infringement Applications Create had sent to Media Journal onto customers' TVpads before they sold them. | Ex. 58 (5/28/14 email from Huang to Song transmitting Solive Transmission Application file to Song); Ex. 59 (2/11/14 email from Huang to Song saying "If TVpad store cannot be recognized, please install using the attached files" and attaching Infringement |

18

PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | | Applications); Ex. 57 (2/12/14 email from Huang instructing: "Please install using the attached files," and attaching the Infringement Applications); Ex. 45 (5/7/14 email from Huang to Song attaching Infringement Applications in a "Korean Application Package" and saying "you can install . . . by saving it to a USB"); Ex. 55 (5/7/14 email from Huang to Song transmitting zip file of Infringement Applications); Ex. 40 (5/12/14 email from Huang to Song attaching Infringement Applications and calling them "app installation file which is used frequently"); Ex. 5 [Media Journal Dep.] 126:6-9. |
| 71. | Media Journal did so. | Ex. 4 [Kim Dep.] 95:2-6; Ex. 5 [Media Journal Dep.] 125:25-133:6. |
| 72. | Song even made a video, which he posted on Youtube, demonstrating how to use a TVpad to display Plaintiffs' Copyrighted Works.  Among other inducements to infringe, Song states therein: "MBC is showing right now, and when you press it like this, the channel comes on."  Create | Ex. 18 [Media Journal RFA Response No. 5]; Ex. 32 [certified translation of the YouTube video created by and featuring Song demonstrating a TVpad; a copy of the video has been |

19

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | underwrote and was aware of this video, and only told Song to take it down after this lawsuit was filed in June 2014. | lodged with the Court]; Ex. 3 [Song Dep.] 141:3-144:21, 150:11-152:2, 153:23-155:8. |
| 73. | Chris Kim was Media Journal's employee from January 2014 through June 2014; Song chose the title of Marketing Director for him. | Ex. 42 (business card); Ex. 4 [Kim Dep.] 65:9-66:19, 78:12-20. |
| 74. | Kim handed out a business card bearing that title to Media Journal's customers. | Ex. 42; Ex. 8 [Lyu Dep.] 68:4-6. |
| 75. | Kim, Media Journal's Marketing Director, does not recall Media Journal promoting the use of TVpads for anything besides watching Korean broadcast television, Korean drama programs and Korean sports telecasts. | Ex. 4 [Kim Dep.] 100:3-101:15. |
| 76. | At Song's direction, Kim would explain to customers that the TVpad can be used to view Plaintiffs' copyrighted programming. | Ex. 4 [Kim Dep.] 39:20-25, 92:2-6 (Q: "And you were aware at the time that you told the consumers to go into the Solive 3 application that Solive 3 transmitted MBC, SBS and KBS broadcast stations?" A: "Yes."); Ex. 4 [Kim Dep.] 94:10-16, 98:12-99:11; Ex. 8 [Lyu Dep.] 70:22-71:24; Se Jin O Decl. ¶ 5. |
| 77. | For instance, in February 2014, Kim handed out flyers boasting that TVpads could be used to watch Plaintiffs' channels via the Infringement | Ex. 80; Ex. 4 [Kim Dep.] 68:2-23, 75:25-76:6; Ex. 3 [Song Dep.] 144:22-145:21 (noting that he instructed Kim to hand out flyers at this |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | Applications. | event because Create would "provide support" if Media Journal promoted TVpads at events). |
| 78. | Kim, along with other Media Journal employees, specifically demonstrated to customers how the Infringement Applications work and how TVpads could be used to view Plaintiffs' copyrighted programming. | Ex. 8 [Lyu Dep.] 63:1-18; 67:8-14; Ex. 18 [Media Journal RFA Response Nos. 29-30]; Ex. 3 [Song Dep.] 150:11-152:2; Ex. 5 [Media Journal Dep.] 95:4-20. |
| 79. | Kim and the other Media Journal employees specifically touted TVpads for their ability to transmit Plaintiffs' telecasts of the 2014 World Cup to the public. | Ex. 4 [Kim Dep.] 70:3-14, 74:4-12; Ex. 80; Ex. 3 [Song Dep.] 139:13 (testifying he promoted use of the TVpad to watch soccer on SBS); Ex. 5 [Media Journal Dep.] 48:4-25. |
| 80. | Create knew Media Journal was promoting the use of TVpads to watch the World Cup on MBC, KBS and SBS, and that its customers were doing so. | Ex. 5 [Media Journal Dep.] 48:4-25; Ex. 37. |
| 81. | Media Journal also advertised TVpads' ability to display Plaintiffs' broadcasts of Major League Baseball Games. | Ex. 47; Ex. 70; Ex. 5 [Media Journal Dep.] 97:4-15; Ex. 22 [4/15/14 email from Song to Korea Daily general manager requesting ad copy to reflect that TVpads transmit Dodgers games]; Ex. 23 [4/16/15 email from Song to Korea Daily general manager requesting full page ad stating that TVpads |

|  | **UNDISPUTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
|  |  | transmit Dodgers games]. |
| 82. | Media Journal also advertised TVpads' ability to display Plaintiffs' broadcasts of of the Incheon games. | Ex. 47; Ex. 5 [Media Journal Dep.] 101:22-9. |
| 83. | Kim also specifically informed customers that TVpads could be used to watch Plaintiffs' copyrighted television shows *Gag Concert*, *2 Days 1 Night* and *Running Man*, with Song's approval. | Ex. 4 [Kim Dep.] 73:9-24, 93:7-21. |
| 84. | Media Journal installed the Infringement Applications onto TVpads for Media Journal's customers before they were sold, and explained that the Infringement Applications were the way customers could do what they purchased the TVpad for:  watch Plaintiffs' Copyrighted Works. | Ex. 77 (5/16/14 email from Kim to Song saying there were "only 6 customers for reinstalling Solive3 and the other Apps today.  I received 3 appointments for tomorrow."); Ex. 57; Ex. 4 [Kim Dep.] 33:2-20, 59:24-60:2, 107:10-109:5, 115:2-116:2, 119:5-24;  Ex. 18 [Media Journal RFA Response Nos. 3, 32, 33]. |
| 85. | Media Journal's policy was to install the Infringement Applications it had received from Create onto ***each and every TVpad it sold*** to customers.  Indeed, it did so when it sold a TVpad to Plaintiffs' investigator on September 20, 2014, five days after Plaintiffs' counsel expressly warned Song's then-counsel of Song's continued willful infringement. | Ex. 4 [Kim Dep.] 107:10-110:14, 125:19-23; Paek Decl. ¶¶ 4-13; Wasserstein Decl. ¶ 105. |
| 86. | Media Journal would visit customers at their homes or businesses to set up | Ex. 18 [Media Journal RFA Response No. 7]; Ex. 8 [Lyu |

22

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | TVpads so that they would display Korean broadcast stations for free. | Dep.] 49:5-24. |
| 87. | If Solive, the Infringing Application that plays Plaintiffs' Copyrighted Works live, was not working, Media Journal employees would fix the problem for customers by installing for them a later version of this particular Infringing Application that Create had provided to Media Journal. | Ex. 4 [Kim Dep.] 126:3-128:18; Ex. 77. |
| 88. | Similarly, if DB TV Theater, the Infringing Application that plays Plaintiffs' Copyrighted Works in video on demand format, was not working, Media Journal employees would fix the problem for customers by implementing a solution Create had devised to ensure the Infringing Application continues to work. | Ex. 4 [Kim Dep.] 134:14-138:23; Ex. 43. |
| 89. | Song trained Media Journal employees including Chris Kim to hand out written instructions to customers on how to use the Infringement Applications, specifying that live TV, including Plaintiffs' channels in particular, are available via the Solive and KKS Transmission Applications, whereas the DB Transmission Applications would permit the customer to access Plaintiffs' programming on a video on demand basis. | Ex. 18; Paek Decl. ¶ 11-12 & Ex. 4; Ex. 61; Ex. 7 [Kang Dep.] 54:16-57:6; Se Jin O Decl. ¶ 15; Ex. 4 [Kim Dep.] 89:11-94:16, 147:23-148:15; Ex. 18 [Media Journal RFA Response No. 6]. |
| 90. | Indeed, Media Journal and Song squarely admit that each "encouraged consumers | Ex. 18 [Media Journal RFA Response No. 2]. |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | to purchase TVPads for the purchase of watching Korean television stations for free, live." | |
| 91. | In less than one year, Media Journal sold at least 1,771 TVpads as of November 2014, grossing over half a million dollars. | Ex. 19 [Media Journal Interrogatory Responses Nos. 9, 11]; Ex. 17 [Song Interrogatory Responses Nos. 10,12]; Sokol Decl., Ex. 2 [Blum Decl.] & Exs. 3 & 4 [Defendants' bank statements]. |
| **Media Journal Sells TVpads Wholesale To Other Retailers, And Instructs Them To Install The Infringement Applications For Each Purchaser** | | |
| 92. | In approximately May 2014, Media Journal entered into a written contract with Defendant Glonet Services, Inc., whereby Glonet purchased 100 TVpads for resale; Glonet is owned by the same person as a store called Missyluxy, Mr. Se Jin O. | Ex. 7 [Kang Dep.] 29:6-11, 33:2-6, 36:8-19, 38:16-19, 46:7-47:1, 60:4-14; Ex. 19 [Media Journal Interrogatory Response No. 7]; Ex. 17 [Song Interrogatory Response No. 8]; Se Jin O Decl. ¶ 7 & Ex. 1. |
| 93. | Defendant Keum S. Kang was an employee of Missyluxy from around March 2014 through around October 2014. | Ex. 7 [Kang Dep.] 20:2-3; 21:7-14. |
| 94. | Mr. Kang signed the contract on behalf of Missyluxy, and Song signed on behalf of Media Journal. | Ex. 7 [Kang Dep.] 60:4-14; 63:11-17. |
| 95. | Media Journal advertised the Missyluxy Fullerton store as one of its own locations. | Ex. 7 [Kang Dep.] 29:6-11; Se Jin O Decl. ¶ 9 & Ex. 4; Ex. 60. |

24

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 96. | Song gave the Infringement Applications to Mr. Kang on a USB stick, so that he could install them onto each of Missyluxy's customers' TVpads before they were sold. | Ex. 7 [Kang Dep.] 43:4-45:1. |
| 97. | Missyluxy sold about 80 of the 100 TVpads it had received from Media Journal by October 2014, for $280 each, which price was set with Media Journal's "guidance."  That price included installation. | Ex. 7 [Kang Dep.] 51:2-10, 68:20-25, 72:24-73:1. |
| 98. | Mr. Kang and other Missyluxy employees installed the Infringement Applications onto each and every one of the 80 TVpads he sold; he did not wait for a customer to request that the Infringement Applications be installed, but rather installed them automatically before the customer took the TVpad home, just as Song had instructed him. | Ex. 7 [Kang Dep.] 43:4-45:1, 53:20-54:9. |
| 99. | Mr. Kang, in turn, taught his boss, Defendant Se Jin O how to install the Infringement Applications onto TVpads. Mr. O did so when he sold TVpads directly to customers.  Song also instructed Mr. O to install the applications in November 2014. | Ex. 7 [Kang Dep.] 53:2-16; Se Jin O Decl. ¶ 11. |
| 100. | Media Journal provided written materials to Mr. Kang, and instructed him to distribute them to Missyluxy's customers, which Mr. Kang did.  Those materials touted the devices' ability to watch | Ex. 61; Ex. 7 [Kang Dep.] 54:16-57:6. |

25

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | Korean broadcast television by way of the Infringement Applications. | |
| 101. | Defendant Se Jin O also distributed these same written materials to his customers. | Se Jin O Decl. ¶ 15 & Ex. 5. |
| **Media Journal Induced TVpad Users To Infringe Plaintiffs' Works By Advertisements And Promotions** | | |
| 102. | Media Journal advertisements promoted the Infringement Applications and encouraged customers to use those applications on TVpads. | Ex. 62; Ex. 63; Ex. 47. |
| 103. | Some of the Media Journal ads also displayed Plaintiffs' trademarked logos, making clear that TVpads could be used to watch Plaintiffs' copyrighted programming. | Ex. 47. |
| 104. | Other Media Journal ads depicted specific Copyrighted Works and made clear they could be viewed for free on TVpads, such as the World Cup. | Ex. 47; Ex. 36; Ex. 5 [Media Journal Dep.] 56:8-57:1. |
| 105. | Create was aware of the nature of Media Journal's advertisements, including those promoting TVpads' transmission of the Olympics, because Media Journal frequently emailed photos and mockups of its ads to Create. | Ex. 65; Ex. 4 [Kim Dep.] 139:2-140:3 ("I was told we were supposed to report to them [Create] as to the fact that we were running this kind of ads in the U.S.A.[,]" referring to ad promoting Olympics); Ex. 3 [Song Dep.] 69:25-70:12 ("whenever the newspaper ad or the radio ad was taken out, we have sent the files to |

26

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | | [Huang]"); Ex. 5 [Media Journal Dep.] 56:8-57:13, 77:22-23 ("all the ads we create were sent to Huang"); Ex. 63. |
| 106. | In fact, **Create funded Media Journal's advertising efforts**, in newspapers, radio and billboards, in the form of "credits" to the tune of thousands of dollars, with the approval of Create's President. | Ex. 64 (2/10/14 email from Huang to Song specifying what he would need to send to get the credit); Ex. 66 (2/14/14 email from Song to Huang saying he will send the February ad pictures later and "want[s] to include credit on this order of 100 units"); Ex. 85 (3/24/14 email from Huang to Song stating that the president is overseas and so they cannot easily "make the Feb AD payment" and will "only be able to apply the $1,000 assistance for Feb. AD to the April order"); Ex. 63 (7/29/14 email from Song to Huang asking for "a lot of support for July" including for a billboard); Ex. 54 (Create invoices to Media Journal showing credits in the amount of $1,000); Ex. 3 [Song Dep.] 70:7-12 (Q: "Why did you send the radio ad and newspaper ad files to [Huang]?"  A: "When we |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | | sent those files and after it was verified, we were able to get support in the advertisement cost, although it was not for 100%."); Ex. 66; Ex. 68; Ex. 69; Ex. 63; Ex. 5 [Media Journal Dep.] 61:12-62:20, 64:25-65:17, 74:2-75:12. |
| 107. | Media Journal admits it advertised, marketed and promoted TVPads through Korea Daily Newspaper, Korea Times Newspaper, The Korea Herald, Sports Seoul, Radio Korea, Radio Seoul, and Radio 1230. | Ex. 19 [Media Journal Interrogatory Response No. 2]; Ex. 17 [Song Interrogatory Response No. 2]. |
| 108. | Create also sent ads to Media Journal. | Ex. 79. |
| 109. | Create knew that it was funding Media Journal ads featuring icons for the Infringing  Applications and/or specific copyrighted works such as the World Cup, Incheon Games and the Olympics. | Ex. 66 (4/1/14 email where Song sends Huang Media Journal ads show infringing app icons); Ex. 70 (3/17/14 email where Song sends Huang Media Journal ads with Plaintiffs' logos, the Infringing Application icons and logos, promoting the Olympics telecasts); Ex. 68 (5/29/14 email showing World Cup ads). |
| 110. | Create liked Song's ads showing the Infringement Applications and particular copyrighted works so much that it asked him if Create could "by any chance use | Ex. 72 (6/9/14 email from Huang to Song). |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | the ad image in our company's official site?" | |
| 111. | Create was aware that intellectual property violations were inherent to using World Cup logos. | Ex. 72 (email from Huang to Song, attaching FIFA IP guidelines). |
| 112. | Media Journal also promoted the use of TVpads to watch Plaintiffs' Copyrighted Works at public events such as rock concerts, including handing out flyers with Plaintiffs' logos, and demonstrating the Infringement Applications. | Ex. 80; Ex. 5 [Media Journal Dep.] 85:10-86:21; Ex. 32 [certified translation of the YouTube video created by and featuring Song demonstrating a TVpad; a copy of the video has been lodged with the Court]. |
| 113. | Create funded those promotions by providing free TVpads and running ads on the TVpad retransmission system itself, at Create's suggestion. | Ex. 73 (4/24/14 email from Huang to Song stating that "what the headquarter can provide" are 30 free TVpads and "we can show the ad screen . . . to the TVpad users in the US or California"); Ex. 76 (TVpad ad re Kim Jong Seo concert); Ex. 74 (9/12/14 email from Song to Huang email asking for support for a golf tournament); Ex. 5 [Media Journal Dep.] 63:17-64:1, 86:22-90:18, 110:18-112:8. |
| 114. | Media Journal's advertisements and promotions were successful; many Los Angeles residents became aware of the device's ability to transmit Plaintiffs' | Ex. 8 [Lyu Dep.] 39:11-46:21 (testifying he first heard of a TVpad through a Media Journal ad and |

29

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | Copyrighted Works to the public through seeing Media Journal advertisements. | purchased a TVpad from Media Journal for the purpose of watching MBC Sports' telecasts of Dodgers games, as Media Journal had advertised TVpads can do). |
| **Compounding The Infringement, Many Los Angeles Area Restaurants Purchased TVpads, Which They Used To Publicly Perform Plaintiffs' Works For Their Customers** | | |
| 115. | Some Los Angeles area restaurants (including Defendants CJ Wilshire, Inc. Chilbo Myunok and Corea BBQ) purchased TVpads for use in their establishments, and thereby the restaurant publicly performs Plaintiffs' copyrighted works to the public both by displaying the television programming to diners and by their TVpad's retransmission of the live Copyrighted Works to others. | Ex. 44 (TVpad playing MBC Sports in Defendant C.J. Wilshire's restaurant); Ex. 8 [Lyu Dep.] 100:2-23 ("there are many restaurants that purchased these [TVpad] devices . . . there are many signs that were posted saying that they are getting ready to show Dodgers games when you go through the Korean community"); Ex. 58 [Yoo Dep.] 37:18-38:8; Ex. 86; Ex. [Crocker Report] ¶¶ 6-12 . |
| 116. | After seeing a Media Journal advertisement, Defendant Corea BBQ purchased its TVpad from Media Journal in April 2014, and Chris Kim came to the restaurant to install it. | Ex. 8 [Lyu Dep.] 15:3-7, 69:2-2014; Ex. 105. |
| 117. | Defendant Corea B.B.Q. purchased the TVpad specifically for the purpose of watching Korean telecasts of Dodgers | Ex. 8 [Lyu Dep.] 43:7-24, 48:2-4. |

30

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | games, including those featuring Korean players Hyun Jin Ryu and Shin Su Choo; that programming comprises a Copyrighted Work of Plaintiff Munhwa. | |
| 118. | Corea BBQ posted flyers outside the restaurant stating that it would be playing the Dodgers games featuring Hyun Jin Ryu. | Ex. 8 [Lyu Dep.] 81:16-83:3. |
| 119. | Mr. Han Kun Lyu, the boss of Corea BBQ, called Media Journal and "was given an explanation that I would be able to watch the baseball game of [Dodgers player] Hyun Jin Ryu through a channel called MBC Sports channel." | Ex. 8 [Lyu Dep.]  46:14-47:12. |
| 120. | Chris Kim told Mr. Lyu that he could use the TVpad to watch KBS and MBC, as well. | Ex. 8 [Lyu Dep.]  46:14-47:12. |
| 121. | Chris Kim set the television up in the restaurant in April 2014 so that it was able to display Munhwa's broadcast of baseball games featuring Hyun Jin Ryu. | Ex. 8 [Lyu Dep.] 49:13-18. |
| 122. | Mr. Lyu and Corea B.B.Q.'s customers watched an MBC broadcast of a Dodgers game where Hyun Jin Ryu was pitching. | Ex. 8 [Lyu Dep.] 51:9-17. |
| 123. | When Corea BBQ's device malfunctioned and stopped displaying the MBC Copyrighted Work consisting of the Dodgers game featuring  Ryu, Kim came to fix it. | Ex. 8 [Lyu Dep.] 50:5-52:6. |
| 124. | Corea BBQ (which does business as | Ex. 8 [Lyu Dep.] 54:10- |

31

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | Myungdong Tofu House) used a TVpad to display five Dodgers games to its customers between April and June 2014, and used it one or two times to show major league baseball games featuring Korean player Shin Su Chu, in all instances the Korean telecasts of the games. | 59:10; Ex. 86. |
| 125. | Defendant restaurant CJ Wilshire, Inc. also used the TVpad to view Korean broadcasts of Dodgers games where Ryu was pitching, and played the MBC Sports telecasts of those games for its customers. | Ex. 10 [Yoo Dep.] 37:17-38:8; Ex. 44. |
| **Song Is *Personally* Liable For Media Journal's Conduct** | | |
| 126. | The original investment money for Media Journal came from Mr. Chris Lim, and was deposited into Song's personal account. | Ex. 49; Ex. 87. |
| 127. | Song used his personal account interchangeably with Media Journal's account at Bank of the West, depending on whatever was convenient. | Sokol Decl., Ex. 4 [Media Journal bank statements, filed under seal]; Sokol Decl., Ex. 3 [Song bank statements, filed under seal]; Ex. 5 [Media Journal Dep.] 152:12-153:5; 157:14-160:12. |
| 128. | Song often used his personal account at Bank of America to receive payments for Media Journal; nearly a third of TVpad sales revenue went solely to Song's personal account, and tens of thousands | Ex. 81 (11/26/14 Missyluxy-Song email confirming $9K was paid to Song's Bank of America account); Ex. 5 [Media Journal Dep.] |

32

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | went to "off the books" accounts. | 152:12-153:5; 157:14-160:12; 161:6-164:11; Se Jin O Decl., Ex. 3 (check for TVpads made out to Song personally); Sokol Decl., Ex. 2 [Blum Decl.]. |
| 129. | Song stated in a March 16, 2014 email that he used his personal account "to order TVPAD from China and to receive the payment for the goods from other distributors." | Ex. 82. |
| 130. | Song also wrote checks from his personal account to pay Media Journal expenses, including to pay his employees. | Sokol Decl., Exs. 2 [Song bank statements] & 3 [Blum Decl.]; Ex. 5 [Media Journal Dep.] 153:14-156:20 |
| 131. | Media Journal's main investor, Chris Lim, was upset that Song wasn't maintaining corporate formalities or keeping Media Journal's assets segregated from Song's personal assets. Lim accused Song of "manag[ing] the company fund as he pleases" and noted that Lim had been "letting it pass[.]" | Ex. 78 (3/8/14 email from Lim to Song). |
| 132. | On March 16, 2014, Song emailed Mr. Lim: "I will open a personal account on Monday to have a separate account for the money for my personal purposes." | Ex. 82. |
| 133. | But Song did not open such an account, and continued to commingle his personal assets with Media Journal's assets. | Ex. 5 [Media Journal Dep.] 169:15-171:20; Sokol Decl., Ex. 4 [Media Journal bank statements, filed under seal]; Sokol Decl., Ex. 3 [Song |

33

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | | bank statements, filed under seal]. |
| 134. | When Song made small payments to Chris Lim to partly compensate Mr. Lim for his over $100,000 investment in Media Journal, Song used money from his personal account. | Lim Dep. 51:1-13. |
| 135. | Media Journal has now shuttered its doors | Ex. 3 [Song Dep.] 15:6-8. |
| **GreatVision is Create's Alter Ego.** | | |
| 136. | The two companies share the same offices.  When Defendant Dylan Song traveled to Shenzhen, China in November 2014 to meet with Create's President and its employee Ms. Darline Huang, and that meeting took place at offices bearing the Great Vision logo. | Ex. 84 (website showing pictures of the Great Vision logo displayed as part of the office with Song's markings as to where he went); Ex. 3 [Song Dep.] 30:3-31:2, 57:7-58:8. |
| 137. | Mr. Chen testified that he visited the Create offices in March 2014, and that they were located in Shenzhen, China. | Ex. 6 [YTC Dep.] 25:3-26:14. |
| 138. | Ms. Darline Huang emailed Song from her Create email address and told him that "[o]ur company address" is the GVTV address in Shenzhen. | Ex. 83. |
| 139. | Ms. Darline Huang lived and worked in China, not Hong Kong. | Ex. 3 [Song Dep.] 29:6-24. |
| 140. | Until June 2014, a month after Plaintiffs filed this lawsuit, the two companies even had the same Managing Director, Mr. Tian Zhigang | Ex. 2; Ex. 88. |

34

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 141. | Mr. Zhigang Tian is still the Managing Director of GVTV, while on June 23, 2014, four months after Create learned of this lawsuit, he expressly approved Mr. Wenwei to take his place as Managing Director of Create. | Ex. 2; Ex. 88. |
| 142. | When inducing U.S. customers and distributors to infringe Plaintiffs' copyrights, Create employees use their Create (Hong Kong) email addresses, signature blocks and seals. | Ex. 36; Ex. 89; Ex. 90 for payment); Ex. 5 [Media Journal Dep.] 147:6-21. |
| 143. | But when dealing with internal matters, these same employees appear to use GVTV email addresses and titles.  For example, in contracting with its U.S. fulfillment center, located in Los Angeles County, Create employee Fanny Huang executed the contract on behalf of Create with the U.S. fulfillment center using her Create signature block, title and even imprinting Create's seal. | Ex. 6 [YTC Dep.] 103:22-105:5; Ex. 31 [signature page from 2014 Create-YTC contract]. |
| 144. | As the contracting party with that fulfillment center, it is Create that makes payments due thereunder. | Ex. 6 [YTC Dep.] 45:25-46:10. |
| 145. | As recently as February 12, 2015, the same Ms. Fanny Huang, in charge of distribution, used her GVTV email address to inform Create's U.S. fulfillment agent of coming shipments. She had used that email address for this purpose since 2013. | Ex. 91 (2015 email from Fanny's GVTV address); Ex. 92 (2013 email from Fanny's GVTV address); Ex. 6 [YTC Dep.] 21:17-22:23. |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 146. | Similarly, Ms. Fanny Huang's boss, Annie Zhang, held herself out as a Create representative, while providing the fulfillment agent with a GVTV email address | Ex. 6 [YTC Dep.] 20:20-21:20. 38:2-24, 40:9-41:21. |
| 147. | The MAC numbers for TVpads shipped through the fulfillment center are logged into a GVTV log in site, but Create receives the order. | Ex. 87; Ex. 6 [YTC Dep.] 112:11-113:16. |
| 148. | Huang was first introduced to a U.S. distributor with a GVTV contact address. | Ex. 21 (12/11/13 email introducing Huang to Song). |
| 149. | Create produced invoices it had to Defendant Media Journal for the sale of TVpads shows in its Meta-Data that the invoices were last saved by "gvtv" prior to transmission to Media Journal. | Wasserstein Decl. ¶ 6. |
| | **Create Distributes The Infringement Applications** | |
| 150. | Create participated in the development of the Solive Infringement Application, and promotes Solive for infringing on Plaintiffs' works on its blog, as well as promoting specific of Plaintiffs' Copyrighted Works and advising on its facebook page as to how to download the Infringement Applications.  Create began promoting Infringement Applications such as Solive specifically to watch Plaintiffs' live broadcasts as part of its TVpad2: "Designed for Revolution" campaign. | Ex. 58 (Huang stating in May 2014 "we have made a request at the Appl company to create SOLIVE 3 (3.0 version"); Ex. 33 (Create's blog promoting Solive); Exs. 94-97. |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 151. | In July of 2014 Huang emailed Song the Solive "Appl[ication] file" from her Create email account, calling the file something "the technical team is creating."  She asked Song to "run a test" of Solive, and told him that if it confirmed the technical problem had been solved, "we'll distribute it via N+ Store," | Ex. 89. |
| 152. | Media Journal would report to Create problems with the DB applications too; Kim and Song were under the impression that to make that Infringing App work again, the "headquarters in Hong Kong" would have to "update the dramas--- upload the dramas promptly[.]" | Ex. 4 [Kim Dep.] 83:16-84:24, 121:13-122 (testifying that the "headquarters in Hong Kong" fixed the problem with Solive); Ex. 38. |
| 153. | While the 2014 World Cup was going on, Media Journal expected Create to ensure that Solive and KKS would function to transmit Plaintiffs' telecasts of those games to the public, and Create did so by fixing a "problem on the server." | Ex. 37; Ex. 5 [Media Journal Dep.] 51:7-53:9; Ex. 36. |
| 154. | Media Journal had intended to develop TVpad Transmission Applications, and Kim and Song tried to work with Create to do so beginning in January 2014. | Ex. 5 [Media Journal Dep.] 22:22:4-14, 24:17-14; Ex. 52; Ex. 53 (1/9/14 email from Huang to Kim noting that "the Hong Kong headquarter" will select a server for the proposed Transmission Application); Ex. 17; Ex. 62 (advertisement created by Song stating that Media |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | | Journal Transmission Application coming soon). |
| 155. | Create provided Media Journal with specifications and price quotes for server use and operation for the Transmission Application, and noted that Create's "headquarter" will "provide support for the standard for file encoding, the detailed work instruction, and encoding skill" and that "our headquarter will be in charge of editing, update and revision for the video file from the App". | Ex. 52; Ex. 53. |
| 156. | Create's charges for "the content storage server" and other fees were too expensive for Media Journal, so no Media Journal Transmission Application was ever developed. | Ex. 5 [Media Journal Dep.] 22:15-23, 29:4-32:9. |
| 157. | Create also distributes the N+ Store, a Transmission Application containing the Infringement Applications. | Ex. 40 (5/12/14 email from Huang to Song attaching N+ Store); Ex. 89; Ex. 5 [Media Journal Dep.]  142:8-144:18 (Song testimony that Create made and distributed the N+ Store). |
| **Create, Song And Kim's Conduct Was Willful, As Each Was Aware That The Public Performances Effectuated By The TVpad Network Were Unlicensed.** | | |
| 158. | Create was aware of the existence and nature of this case from its inception; "the person in charge of the Korean side of the business" at Create, Ms. Darline Huang, along with Song himself, kept Create's | Ex. 3 [Song Dep.] 16:19-17:2, 27:6-18 (testifying Huang was "in charge of Korean people who were selling TVpads around the |

38

| | **UNDISPUTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
| | CEO up to date on the lawsuit as it progressed. | world" at Create), 29:23-30:8 (testifying Song visited Huang at Create's place of business in Shenzhen, China); Ex. 98 (privilege log showing Complaint was sent to Huang the day after it was filed, 6/3/14). |
| 159. | In February 2014, Plaintiffs sent cease and desist letters to Defendants; Song provided that letter to Create. | Ex. 5 [Media Journal Dep.] 67:2-68:1; Ex. 24 (2/24/14 email from Huang to Song containing lawyer's advice not to use Plaintiffs' logos in ads or sell devices with Transmission Applications installed, produced by Create bearing Bates-number CNT0000803); Ex. 25 (2/20/14 cease and desist letter sent from Plaintiffs to Song); Ex. 132 (2/20/14 cease and desist letter sent from Plaintiffs to Defendant Best4U, Inc.). |
| 160. | The local Defendants responded later that month, claiming that they did not install any Transmission Applications on TVpads that had the ability to infringe Plaintiffs' works, with Create's knowledge. | Ex. 71. |
| 161. | It took Create until January 13, 2015, nearly 11 months after receiving Plaintiffs cease and desist letter, to finally purge | Ex. 26 (1/13/15 email from Create to N+ Store stating it "recently" received |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | Infringement Applications from the TVpad store. | Plaintiffs' complaint alleging infringement and requesting removal of Transmission Applications "like" Solive, KKS and the DB apps inter alia, and stating that Create would "stick with our plan to deal with this matter until lawful licenses are provided for the related apps," produced by Create as CNT 1161); see also Ex. 98. |
| 162. | In fact, starting in April 2014, Create compensated Defendants Media Journal and Song for amounts expended on attorneys' fees by sending approximately $70,000 worth of free TVpad devices, with the approval and knowledge of Create's President.  In January 2015, the President decided to stop providing the free TVpads to Song. | Ex. 72 (6/9/14 email from Huang to Song saying she "submitted the expenses for the lawsuit to the President for approval" but he was on a business trip to Shanghai); Ex. 3 [Song Dep.] 31:2-33:2 (testifying he also met with Create's CEO to discuss "the legal issue" during that trip and that Song was told Create was "helping so [he] shouldn't worry" ); 34:13-20, 51:20-53:5, 63:12-21 ("Q. What legal matters did you discuss [in your meeting with Create's CEO]? A: " . . . [Create] promised from the beginning that they were going to provide the support for these legal fees . . . when we received a letter relating |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | | to this legal issue, we sent that letter to [Create], and the response we got from [Create] was that if we hire an attorney, they were going to provide support in terms of the legal fees."), 64:19-65:13. |
| 163. | In February 2014, Plaintiffs sent cease and desist letters to Defendants Media Journal and Bestway Realty, as well as some of the newspapers in which Media Journal advertised; Song provided that letter to Create. | Ex. 5 [Media Journal Dep.] 67:2-68:1; Ex. 56; Ex. 24 (2/24/14 email from Huang to Song containing lawyer's advice not to use Plaintiffs' logos in ads or sell devices with Transmission Applications installed, produced by Create bearing Bates-number CNT0000803); Ex. 25 (2/20/14 cease and desist letter sent from Plaintiffs to Song); Ex. 132 (2/20/14 cease and desist letter sent from Plaintiffs to Defendant Best4U, Inc.). |
| 164. | Create told Media Journal in some correspondence not to install any Transmission Applications, aware that doing so would incur liability based on advice received by its own lawyer. | Ex. 75. |
| 165. | For the same reason, Create told Media Journal not to use Plaintiffs' logos in ads. | Ex. 75. |

41

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 166. | Create sent a "Notice to Distributors" document that instructs distributors not to install or promote Infringement Applications. | Ex. 56 (2/14/14 Yafans-Song mail sending the doc in response to Song's queries about cease and desist letters). |
| 167. | Create's lawyer's instruction was simply "don't use wording such as 'SBS or MBC' in advertising or promotion documents" and "do not sell it with application installed." | Ex. 24 (2/24/14 email from Huang to Song containing lawyer's advice not to use Plaintiffs' logos in ads or sell devices with Transmission Applications installed, produced by Create bearing Bates-number CNT0000803) |
| 168. | On March 21, 2014, Defendants Media Journal and Bestway Realty sent a letter to Alan Ross, former counsel for Plaintiffs, falsely stating that Media Journal and Bestway have "never installed any software or applications on the Device for purchasers and end users. Nor have our clients assisted purchasers or end-users of the Device in installing any software or applications in any manner.  Our clients do not indicate to purchasers and end-users that the Device may be used to view copyrighted content, nor do our clients advertise that the Device is compatible with any software in order to view the copyrighted content." | Ex. 71. |
| 169. | Create was aware of this lawsuit since its inception, and Dylan Song and his former counsel the Ryu Law Firm sent Plaintiffs' | Ex. 98 (privilege log showing Complaint sent to Huang 6/3/14); Wasserstein |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | **UNDISPUTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
| | original Complaint, filed June 2, 2014, to Create on June 3, 2014. | Decl. ¶ 104. |
| 170. | Create gave Song approval to run a full-page advertisement on September 3, 2014 in the Los Angeles newspaper the Koreatown Daily after this Court denied Plaintiffs' *preliminary* injunction, representing that Media Journal was "celebrating on winning a lawsuit," and for that reason was having a "fire sale" of TVpads. | Ex. 5 [Media Journal Dep.] 57:18-59:16; Ex. 27 (9/3/14 advertisement in Koreatown Daily). |
| 171. | On November 5, 2014, Song gave a radio interview on Radio Korea in which he stated that TVpads are legal, that the restaurants had won and been dismissed, and encouraged consumers to purchase them for the purpose of watching Plaintiffs' copyrighted programming. | Ex. 28 (translation of Nov. 5, 2014 radio interview). |
| 172. | On April 1, 2015, Plaintiffs' counsel sent a cease and desist letter to counsel for Create providing notice that the HOT韩剧社  application infringed Plaintiffs' Copyrighted Works and was being promoted on the TVpad4. | Ex. 99. |
| **Defendants Infringe Plaintiffs' Trademarks** | | |
| 173. | Munhwa through its U.S. affiliates, has continuously broadcast, distributed and sold its television broadcast programs in interstate commerce, under the distinctive trademark MBC®.  Munhwa's broadcasts | Kim Decl. ¶¶ 7-8. |

43

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | bear the distinctive MBC® mark ("MBC Mark"). | |
| | Munhwa through its U.S. affiliates, has also continuously broadcast, distributed and sold its television broadcast programs in interstate commerce, under the distinctive trademark MBCD®. Munhwa's broadcasts bear the distinctive MBCD® mark("MBCD Mark"). | |
| | Munhwa through its U.S. affiliates, has also continuously broadcast, distributed and sold its television broadcast programs in interstate commerce, under the distinctive trademark MBC Sports. Munhwa's broadcasts bear the distinctive MBC Sports mark ("MBC Sports Mark," and collectively with the MBC Mark and MBCD Mark, the "MBC Marks"). | |
| | The MBC Marks, including the MBC Sports Mark, have acquired secondary meaning in that they have come to be associated by the trade and consuming public exclusively with Munhwa, and have come to signify Munhwa as the source of authorized broadcasts and programs bearing the MBC Marks. | |
| | Munhwa has obtained, and is the owner of, a federal registration on the MBC Mark, which is valid and enforceable throughout the United States.  Munhwa has also obtained, and is the owner of, a federal registration on the MBCD Mark, which is valid and enforceable throughout | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | the United States. | |
| 174. | SBS, through license of its parent company, has continuously broadcast, distributed and sold television broadcast programs in interstate commerce, under the distinctive trademark SBS ("SBS Mark"). Additionally, for many years, and prior to the acts of Best4U discussed herein, SBS, through license of its parent company, has continuously broadcast, distributed and sold television broadcast programs in interstate commerce, under the distinctive trademark SEOUL BROADCASTING SYSTEM®.  SBS' broadcasts include the distinctive mark SEOUL BROADCASTING SYSTEM ("SEOUL BROADCASTING SYSTEM Mark," and collectively with the SBS Mark, the "SBS Marks"). The SBS Marks have acquired secondary meaning in that they have come to be associated by the trade and consuming public exclusively with SBS, and have come to signify SBS as the source of authorized broadcasts and programs bearing the mark. SBS is the exclusive U.S. licensee of a federal registration on the SEOUL BROADCASTING SYSTEM Mark, which is valid and enforceable throughout the United States. | Lee Decl. ¶¶ 7-8. |

45

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 175. | KBS, through license of its parent company, has continuously broadcast, distributed and sold its television broadcast programs in interstate commerce, under the distinctive trademark KBS WORLD®.  KBS' broadcasts bear the distinctive KBS WORLD® mark ("KBS WORLD Mark"). | Chang Decl. ¶¶ 7-8. |
| | KBS, through license of its parent company, has continuously broadcast, distributed and sold its television broadcast programs in interstate commerce, under the distinctive trademark KBS.  KBS' broadcasts bear the distinctive KBS mark ("KBS Mark"). | |
| | KBS, through license of its parent company, has continuously broadcast, distributed and sold its television broadcast programs in interstate commerce, under the distinctive trademark KBS AMERICA®.  KBS' broadcasts bear the distinctive KBS AMERICA ® mark ("KBS AMERICA Mark," and collectively with the KBS Mark and the KBS WORLD Mark, the "KBS Marks"). | |
| | KBS is the exclusive U.S. licensee of a federal registration on the KBS AMERICA Mark, which is valid and enforceable throughout the United States.  KBS is the exclusive U.S. licensee of a federal registration on the KBS WORLD | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ISO MSJ**

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | Mark, which is valid and enforceable throughout the United States. | |
| 176. | The use, marketing, distribution, advertising, and promotion of Plaintiffs' broadcasts and programs displaying the MBC Marks, SBS Marks, and KBS Marks (hereinafter "Plaintiffs' Marks"), or marks confusingly similar thereto, for which Best4U is vicariously liable is likely to cause, and has caused, confusion, mistake, and deception among the consuming public that such activity is licensed, approved, or authorized by Plaintiffs, which is an infringement of Plaintiffs' federal and common law trademark rights in Plaintiffs' Marks in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a). | Sokol Decl., Ex. 1 [Blum Report, filed under seal] ¶¶ 39, 66, 111, 112; Chang Decl. ¶¶ 7-8; Lee Decl. ¶¶ 7-8; Kim Decl. ¶¶ 7-8; Notice of Lodging [Song's YouTube Video]; Ex. 32 [translation of YouTube video]. |
| 177. | Defendants' use of Plaintiffs' Marks also constitutes trademark infringement of Plaintiffs' federally registered trademarks in violation of the Lanham Act, 15 U.S.C. §1114, to the substantial and irreparable injury of the public and Plaintiffs' business reputation and goodwill. | Sokol Decl., Ex. 1 [Blum Report, filed under seal] ¶¶ 39, 66, 111, 112; Chang Decl. ¶¶ 7-8; Lee Decl. ¶¶ 7-8; Kim Decl. ¶¶ 7-8; Notice of Lodging [Song's YouTube Video]; Ex. 32 [translation of YouTube video]. |
| 178. | Plaintiffs' marks (e.g. MBC and SBS) are identically displayed on screen; among other TVpad transmissions, transmissions of the World Cup via TVpads violated the | Ex. 44; Notice of Lodging [Song's YouTube Video]; Ex. 32 [translation of YouTube video]. |

47

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | trademark rights of Plaintiff SBS and Plaintiff KBS. | |

Dated:      April 20,  2015          JONES DAY


By: */s/ Brent D. Sokol*
          Brent D. Sokol

Attorneys for Plaintiffs
MUNHWA BROADCASTING
CORPORATION; MBC AMERICA
HOLDINGS, INC; SEOUL
BROADCASTING SYSTEM
INTERNATIONAL, INC.; and KBS
AMERICA, INC.